In re VALLEY HISTORIC LIMITED
PARTNERSHIP, Debtor.

No. 02–80916–RGM.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Dec. 22, 2003.

Thomas P. Gorman, Tyler, Bartl, Gorman & Ramsdell, PLC, Alexandria, VA, for Debtor.

Jack Frankel, Office of the U.S. Trustee, Alexandria, VA, for U.S. Trustee.

## MEMORANDUM OPINION

ROBERT G. MAYER, Bankruptcy Judge.

This case was before the court on October 27, 2003, for a hearing on the confirmation of the debtor's chapter 11 plan, the objections thereto, the two motions of The Bank of New York as Successor Indenture Trustee ("Indenture Trustee") for relief from the automatic stay and the debtor's objection to the proof of claim filed by The Bank of New York. The court confirmed the debtor's plan, denied the Indenture Trustee's motion for relief from the automatic stay seeking to foreclose the lien of its deed of trust, granted the Indenture Trustee's motion for relief as to distribution of payments (which was by consent) and ruled on the debtor's objection to the Indenture Trustee's proof of claim except for the Indenture Trustee's attorney's fees. The amount of attorney's fees requested to be included in the proof of claim was $153,492.00. The amount was left open so that Williams Mullen, counsel for the Indenture Trustee, could supplement its time records through the date of the hearing. It has done so and the court previously announced that it would allow attorney's fees in the amount of $72,500.00 and costs in the amount of $9,295.51. *See* Memorandum Opinion (Doc. Entry 168). This memorandum sets forth the court's reasons for the award.

The Indenture Trustee is contractually entitled to recover its reasonable attorney's fees in the "Event of a Default", a defined term under the documents. *See* Exhibit A, Indenture of Trust dated as of May 1, 1992, § 10.02. Virginia law applies to the Indenture Trustees's recovery of attorney's fees. *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000); *See* Ex. A, § 13.07 (contractual provision agreeing to choice of law). In Virginia, counsel must establish that the fees charged are reasonable. *Seyfarth, Shaw, Fairweather & Geraldson v. Lake Fairfax Seven Ltd. Partnership*, 253 Va. 93, 96, 480 S.E.2d 471, 473 (1997) (suit by law firm to recover fees from former client). The court should consider "such circumstances as the time consumed, the effort expended, the nature of the services rendered, and other attending circumstances." *Mullins v. Richlands Nat'l Bank*, 241 Va. 447, 449, 403 S.E.2d 334, 335 (1991) (bank seeking to recover its attorney's fees from adverse party). It should also consider the nature of the services, the time expended and any other circumstances. *Holmes v. LG Marion Corp.*, 258 Va. 473, 479, 521 S.E.2d 528, 533 (1999) (award of attorney's fees under Virginia Consumer Protection Act). In

*Holmes,* the trial court considered whether time expended was "excessive, redundant or otherwise unnecessary" and claims upon which the plaintiff did not prevail. *Id.* 258 Va. at 480, 521 S.E.2d at 533.[1]

### The Transaction

The Industrial Development Authority of the City of Staunton, Virginia, (the "Authority") entered into a Loan Agreement with Virginia Historic Properties, Inc., as of May 1, 1992, in which it agreed to loan Virginia Historic Properties $2,000,000 derived from the sale of an economic development revenue bond. Ex. B. The proceeds of the loan were to be used by Virginia Historic Properties for the acquisition, construction, renovation and equipping of two historic buildings in downtown Staunton, Virginia, known as the Stratton Building and the Staunton Creamery Building. Ex. B at 1. The Authority entered into an Indenture of Trust with Signet Trust Company as trustee which governed the relationship of the Authority, the Indenture Trustee and the bondholders. Ex. A. The bonds were sold and the loan funded.

### Performance and Emergence of Claimed Default

The administration of the revenue bond appears remarkably without incident for the first nine years of the ten-year term of the note. The debtor had a long-term lease with Valley Community Services Board which fully funded the debtor's obligations under the note. Valley Community Services Board appears to have faithfully paid its rent and the debtor faithfully paid its note. The monthly note payments consisted of principal and interest. The principal was, generally, one-twelfth of the bond maturing on May 1 of each year. Ex. A, § 6.03(b). The amounts of the bonds were set out in § 2.02 of the Trust Indenture. The schedule of bonds listed ten bonds. The first nine were each in the amount of $100,000. The last bond was in the amount of $1,100,000 and matured on May 1, 2002. Before May 1 of each year, the Indenture Trustee wrote to the debtor and advised it of the monthly payment due for the last year. The monthly payment for the first nine years of the loan was $8,333.33 plus interest. However, for the tenth year, the Indenture Trustee demanded $91,666.67 plus interest per month. The debtor took issue with the Indenture Trustee and asserted that its monthly payment should be, as in the prior nine years, $8,333.33 plus interest, with a balloon payment of $1,000,000 on May 1, 2002. The Indenture Trustee argued that it was only computing the payment in accordance with the plain language of the documents and that the payment, as it computed it, would fully amortize the debt by the end of the tenth year. The debtor noted that its tenant's rent did not increase to even remotely cover the proposed increased payment and that the basis of the transaction had been to service the debt from the cash flow—the rental payments—from the property. The debtor would then refinance the $1,000,000 balloon payment on or before its maturity date. Any other interpretation of the loan

---

1. These considerations may be the same as those used by federal courts in applying the lodestar method. *See Holmes,* 258 Va. at 480 n. 2, 521 S.E.2d at 533 n. 2. The federal standards are applied in *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891, (1984); *Daly v. Hill,* 790 F.2d 1071 (4th Cir. 1986); *Harman v. Levin,* 772 F.2d 1150 (4th Cir.1985); *Ballard v. Schweiker,* 724 F.2d 1094 (4th Cir.1984); *Arnold v. Burger King Corporation,* 719 F.2d 63 (4th Cir.1983); *Barber v. Kimbrell's Inc.,* 577 F.2d 216 (4th Cir. 1978); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974); *In re King,* 88 B.R. 768, 770 (Bankr.E.D.Va.1988). Congress basically adopted the federal factors in 11 U.S.C. § 330(a)(3) and (4) for fee awards for professionals employed by the estate.

documents, the debtor asserted, made no economic sense and led to an absurd result. It simply did not have and was never expected to have the financial ability to make such large monthly payments in the final year of the loan. Such an obligation would force the debtor to refinance not at the end of the tenth year, but at the beginning of the tenth year, thereby effectively shortening the term of the note by a year. The debtor and the Indenture Trustee sparred over this issue for much of the final year. During that time, the debtor paid an amount each month computed in the same manner as during the first nine years with the expectation of making a balloon payment on May 1, 2002.

The debtor began its search for a lender to refinance the balloon payment. It asserts that it found a lender that would finance the final payment, but on February 21, 2002, the Indenture Trustee issued a Notice of Event of Default (Ex. I) which killed the prospective refinance and precipitated the filing of the petition in this case.[2]

One other matter concerning performance under the Loan Agreement was raised by the Indenture Trustee. The Loan Agreement limited the transfer of the property. A transfer was permitted with the consent of the Authority if certain conditions were met. One condition was that the "Transferee must be formed as a limited partnership under Virginia law whose general partner is the Borrower." Ex. B, § 5.9. On December 22, 1992, Virginia Historic Properties, Inc., conveyed the property to Valley Historic Limited Partnership, the debtor. The debtor's Statement of Financial Affairs identifies VHP Real Estate Mgt. Inc. as the sole general partner. The testimony at the confirmation hearing was that The Bank of New York as successor Indenture Trustee to Signet had no record of the consent to the transfer while the debtor's representative testified that consent was obtained and that Signet, the original indenture trustee, knew of the transfer. Except as a litigation issue in this bankruptcy, the transfer issue was never raised between the parties.

## Nature of this Case

This case is a basic real estate case. There is, essentially, a single real estate asset with a single large secured lender. While there are other smaller creditors, none is material when compared to the Indenture Trustee. The parties disagreed as to the value of the real estate. The Indenture Trustee asserted a low valuation—$1,050,000[3]—based on the fact that the single long-term lease will expire in 2004. Its appraiser principally relied on the income method to value the property and assumed that the property would have a high vacancy rate for some time while it was being re-let. Ex. HH at i, 25, 34–38. He, therefore, arrived at a low valuation.[4] The debtor's appraiser reached a much higher valuation—$2,485,000—principally applying the sales comparison method. Ex. 1. The parties seemingly agreed to a significant delay in the case when it appeared that the current tenant was interested in purchasing the property or in renewing its lease. The tenant ultimately extended its lease for a year but declined to purchase the property.

## Discussion

 The debtor complained that the Indenture Trustee's request for attorney's

---

**2.** The petition was filed on February 27, 2002.

**3.** The estimated liquidation value was $840,000.

**4.** He reconciled his Discounted Cash Flow Analysis valuation of $1,040,000 with his Sales Comparison valuation of $1,250,000 to $1,050,000. Ex. HH at 49.

fees was unreasonable. For a comparable period of time, from the beginning of the case through May 30, 2003, the Indenture Trustee's attorney's fees were about three times more than the debtor's attorney's fees. Normally, one would expect a debtor's attorney's fees to be higher than those of any particular creditor. A debtor must engage all creditors on all issues raised. An individual creditor has a more limited interest in the case. A debtor must prepare schedules and the statement of financial affairs. A debtor must formulate, prepare and obtain approval of a disclosure statement and plan of reorganization. That is almost always more time consuming that a creditor's review and reaction to a plan. A debtor must comply with financial reporting requirements. A creditor may review the reports, but does not have to prepare or file any of its own. In general, a debtor is juggling many balls at the same time, trying to keep them all in the air. A creditor is only interested in getting his ball back. He has no interest in whether a debtor keeps the rest in the air or where they may fall. Where, as here, the case is a basic real estate case and the creditor's attorney's fees are so disproportionate to the nature of the case, the work that would be expected and the debtor's attorney's fee, any presumption that the attorney's fees claimed under the proof of claim are validly claimed has been overcome and a further examination is warranted.

### Staffing of Case

The staffing of the case is the first and most striking matter apparent from the bills. All of the debtor's legal work through May 30, 2003, was performed, with a single exception, by one attorney, Thomas P. Gorman.[5] The Indenture Trustee, on the other hand, utilized the services of 17 professionals—five partners, three associates, one attorney who was of counsel to the law firm, and eight paralegals. The number of professionals arrayed against the debtor is even more striking when the number of in-house professionals utilized by the Indenture Trustee is also considered.[6] In addition, not only did the tenant and the United States Trustee have counsel and participate in the case, but there were additional opposing counsel identified in Gorman's time records. The disparity between the staffing of the case by the debtor and the Indenture Trustee is significant.

A staffing disparity may be justified by the nature of the case. Here, however, there is nothing about the case that justifies it. Three attorneys, all partners at Williams Mullen, each billed over $40,000 during the case. There simply were not

5. This is highlighted by the fact that the sole exception was 1.8 hours billed by Steven B. Ramsdell to cover one court appearance on July 9, 2002.

6. The Indenture Trustee sought its costs for the in-house professionals. These were entirely disallowed. The Indenture Trustee was obviously using the services of its in-house professionals as a profit center. It billed the debtor for services at an amount far in excess of its actual costs. One employee was billed at $400 an hour; another at $250 an hour. The operative documents obligated the debtor to pay the reasonable *costs* incurred in connection with a default. Costs, though, means actual costs without mark-up or profit to the bondholders or the Indenture Trustee. The debtor only agreed to make them whole in the event of a default, not to enrich them. The Indenture Trustee had the ultimate burden of proof on the reasonableness of its costs. Since it presented no evidence of the reasonableness of its costs, much less of its actual costs, the court was unable to distinguish actual, reasonable costs from the inflated costs. All costs were disallowed. The normal administrative fee that had been charged throughout the administration of the loan and not related to any default was allowed.

enough issues presented by this basic real estate case to justify the total number of attorneys or the significant effort of three partners. The issues that were or might have been determinative in this case were the use of cash collateral by the debtor, the valuation of the property and the confirmation of the plan of reorganization.

The cash collateral issue was fairly basic and was not complex. The sole source of income for the debtor was the rent from the real estate. The principal uses that would likely be approved over the Indenture Trustee's objection would be to maintain the property, pay the bonds and, possibly, pay the costs of administration of the case. It appears that pre-petition the debtor maintained a positive cash flow, including timely payment of the notes. The resolution of such an issue in this case should not have been a large undertaking requiring multiple attorneys and the expenditure of significant time.

The valuation issue drove the relief from stay issue and the confirmation issues. The hearing on both was combined and was the heart of the case. These issues simply did not warrant a 17–person legal team. The work could have been accomplished—and ultimately was accomplished—by a single partner experienced in bankruptcy matters.[7] The assistance of an associate would not be objectionable. Additional attorneys may have been consulted from time to time as necessary on specific matters within their expertise, but such consultations should have been minimal.

The overstaffing of the case is further evinced by the substantive areas of expertise of those who were assigned to the case. The partner-in-charge is not a bankruptcy attorney. His area of expertise is bonds and corporate finance. He appears to have been the original client contact.[8] He billed a total of $42,926.00, which is 27.4% of the total billing although a review of the significant pleadings reveals that he signed none of them. He made no court appearances. Moreover, there were no significant bond issues presented in this case. While the bond structure differs from the typical secured promissory note, it is apparent that Gorman readily adapted to those structural differences. Except for a few relatively minor matters, the fact that this case involved a bond rather than a note had no significant impact. Significant involvement of bond counsel was unnecessary.

The partner-in-charge of the case was also the principal client contact. There is nothing intrinsically wrong in a bankruptcy case with having a non-bankruptcy attorney as the partner-in-charge or the principal client contact. The management and coordination of a legal team is as important as the legal work itself. A working knowledge of the substantive law and issues is necessary, but one need not necessarily be an expert in the applicable field. However, there must be a need for a legal team of sufficient size to warrant a separate managing partner-in-charge and the additional time expended. The additional expense must be required by the nature of the case and the needs of the case. A separate managing partner-in-

---

7. The attorney was C. Grigsby Scifres who tried the confirmation and relief from stay matters and did a very good job. He could obviously have handled the entire case for the Indenture Trustee himself. The bulk of the fees awarded are for his time and effort, very little of which was reduced by the court.

8. The first time entry on the bills submitted was on February 7, 2002. The first time entry other than his was on March 12, 2002. His time constituted almost 48% of the dollars billed through August 30, 2002.

charge—in this case, one who is not lead trial counsel—should restrict his involvement to management and his substantive area of expertise. As discussed above, in this case there is no apparent reason for a legal team of the size that Williams Mullen fielded.[9]

### Reasonable Control over Litigation

■ Reasonable control over the legal representation was maintained by neither the partner-in-charge nor the Indenture Trustee. The time records leave the distinct impression that issues were explored beyond the point where any meaningful benefit to the Indenture Trustee's position could be reasonably anticipated. For example, one of the first time entries, the time entry for March 21, 2002, states, "Review pertinent bond documents; telephone call to Gorman regarding transfer documents; begin drafting memo regarding *potential causes of action by Trustee to preserve collateral*." (Emphasis added.) Ex. L. At that time, the most likely areas for profitable inquiry were the use of cash collateral and relief from the automatic stay, both of which involved valuation issues. The time entry, is susceptible to the interpretation that these were the only areas under consideration and that the research was focused, however, in light of other time entries both before and after this one, it is more reasonably interpreted to reflect a much broader, more shotgun-type inquiry and one that diverges from the issues likely to arise in a bankruptcy case. Some of the research appears to have focused on the use of cash collateral although the first specific reference to cash collateral is not until April 9, 2002.[10] How-

ever, the time records reflect that other matters were also extensively researched. Counsel for the Indenture Trustee appears to have researched the transfer issue and the ability of a debtor to modify the terms of a note of which it was not the maker. In this case, the note was secured by the lien of a deed of trust on the debtor's property. The idea researched was whether the debtor could modify the terms of the note where it was not the maker and had not assumed the note. A modification of the note would, the Indenture Trustee argued, necessarily protect the original non-filing maker because the Indenture Trustee's rights were determined by the note itself. Moreover, the Indenture Trustee argued the ability of a debtor to cure a default is limited to those instances where the debtor has a pre-petition right which in this case, it did not because there was no privity of contract between the debtor and the maker. *See* Reply to Debtor's Response and Memorandum in Support of Motion for Relief from Automatic Stay for Cause. (Docket Entry 119).

There is nothing improper with counsel thoroughly researching multiple issues, including issues that are not anticipated to ripen into winning approaches as long as the client who is paying the bill understands the purpose and the likely results and authorizes the research. From time to time what at first blush appears to be a tenuous theory becomes the winning argument. But it is different when the party who is asked to pay for the research has no control over it. Flights of fancy cannot be charged to a debtor under a "reasonable attorney's fee" provision in a note. The research must be reasonably related

---

9. An attorney must communicate with his client. The Indenture Trustee does not hold the bonds and there is a need to communicate and coordinate with the bondholders, a factor not frequently present in other cases. Here, however, there were two principal bondhold-

ers, both substantial banks which merged during the course of the proceedings. Part of the fees allowed reflect this.

10. The motion was filed on April 25, 2002 and heard on May 14, 2002.

to the issues in the case and reasonably likely to benefit the creditor's position. A debtor is not to be buried under insurmountable attorney's fees that render a feasible plan impossible to perform, or that unnecessarily burden a debtor.

The Bank of New York, the Indenture Trustee, failed to exercise reasonable control over its legal counsel. It appears that the Indenture Trustee fully expected the debtor to pay all legal fees incurred. The Indenture Trustee clearly knew what was happening in the case. The time records reflect numerous communications between the Indenture Trustee and the law firm. Bills were prepared and sent monthly. What is striking, is that while the Indenture Trustee always had the financial capacity to advance the legal fees or to call on the bondholders to advance funds for the payment of legal fees, it did not. Of $156,623.00 in fees and $9,501.01 in costs billed, only two payments totaling $25,114.88 were ever made. The larger payment was by a check dated July 29, 2002. The second and last payment was made about September 10, 2002. Payment of both were approved by the individual with whom Williams Mullen frequently communicated. Ex. O; Ex. Q. The last statement, dated November 7, 2003, reflects a balance due of $141,009.13. The law firm carried a balance due from the Indenture Trustee for more than fourteen months.

### Reasonableness of Time to Complete Work

Another important consideration is the efficiency of Indenture Trustee's counsel.

The billing records reflect that counsel simply expended too much time to accomplish the tasks undertaken. A comparison of Williams Mullen's time expended on the cash collateral matter with the time expended by debtor's counsel is illustrative. Williams Mullen expended about 46.7 hours to Gorman's 4.8 hours. Williams Mullen billed at least $10,000 while Gorman billed $1,200. Williams Mullen assigned two partners, one associate and two paralegals to the task. Gorman handled it all for the debtor. Williams Mullen took 20.8 hours to prepare the motion to prohibit use of cash collateral. Gorman spent less than two hours preparing the response. The motion was most comprehensive.[11] (Docket Entry 14). However, the gist merely restated the debtor's obligation to obtain approval to use cash collateral before using it. It cited no instance of the debtor's breach of this condition. It alleged no impairment of its collateral or imminent harm. The debtor's two-page response was to the point: The debtor had faithfully made its monthly payments to date and was continuing to make its monthly payments;[12] the Indenture Trustee had improperly defaulted the debtor; and the Indenture Trustee was adequately protected by a "substantial equity cushion in the property." Williams Mullen expended 9.8 hours preparing for the cash collateral hearing, 11.6 hours attending the hearing and communicating with its client afterwards, 3.7 hours on preparing the order and 0.8 hours reviewing the order

---

**11.** The motion was 10 pages long and was accompanied by seven exhibits that were a total of 173 pages in length.

**12.** Of course, the Indenture Trustee and the debtor disagreed as to what those payments were. The debtor asserted that they were $16,812.50 while the Indenture Trustee asserted that they were $100,154.84. *See* Mo-

tion of the Bank of New York for Adequate Protection, Objection to Unauthorized Use of Cash Collateral Without Consent, and Included Memorandum in Support of Motion, ¶ 22. (Docket Entry 14.) The Indenture Trustee did not overlook the opportunity to point out that its claim included "attorney's fees incurred or anticipated by the Trustee." Motion, ¶ 22.

after entered by the court. The last activity was billed by two attorneys at separate times. Gorman, however, spent only 0.65 hours preparing for the hearing, 1.00 hour attending the hearing, 0.75 hours preparing the order and 0.2 hours reviewing the order after entered by the court.[13] The result of the hearing was that the debtor was authorized to receive the rents and use the cash collateral for the payment of the note in the amount of $16,812.50 per month, the necessary and essential operating expenses in managing and maintaining the property and such further expenses as may be later authorized by the court. *See* Order entered on July 3, 2002. (Docket Entry 26).

Prior to filing the motion, there are no documented telephone calls or other communications between counsel specifically relating to the use of cash collateral. After the hearing, an associate at Williams Mullen spent 3.7 hours drafting a proposed order and filing an objection to the sketch order proposed by the debtor, a proposed order that was never submitted to the court. *See* Objection to Debtor's Proposed Sketch Order. (Docket Entry 21). The objection was filed on May 29, 2002. The only documented communication between counsel on the cash collateral order was on that day. The conversation is on both Gorman's time records (Docket Entry 136) and Williams Mullen's time records. Ex. L. This ten-minute telephone conversation appears to have resolved the form of the order.[14]

Some of the inefficiencies may simply be the result of the lack of familiarity with bankruptcy proceedings. Clients expect attorneys to research their case, but they do not expect to pay for their attorney's legal education. The line is sometimes difficult to draw, but a law firm must exercise its billing discretion to reflect the difference. Here Williams Mullen charged 2.1 hours to "Analyze procedures for motion for adequate protection motion and hearing on objection to use of cash collateral." Ex. L. On the same day, another attorney's time entry stated, "analysis of strategies to capture cash flow." Ex. L. Perhaps this was merely an inapt expression of the cash collateral issue, but both entries suggest a lack of familiarity with bankruptcy proceedings, one on the procedural side, the other on the substantive side. These types of time entries are repeated in the billings.

*Other Billing Matters*

■ There are matters that should not be billed to the debtor. There are intra-creditor matters, particularly relating to the negotiation, preparation and execution of indemnities and other control issues. There are paralegal expenses billed for clerical matters. For example, on May 1, 2002, a paralegal charged for scanning the Rule 2019 notice and filing it electronically with the court. The paralegal billed at the rate of $100.00 per hour. This is clerical work that should not be separately charged. It is simply part of the overhead

---

13. This is not to suggest that the creditor's counsel is limited by the amount of the debtor's counsel's billing. However, where both sides are working on the same issue, the time expended by both is a basis for comparison. The court recognizes that many times one side has a much easier task than the other. In those situations the difference in the time expended by each side will be greater than when the issues, factual or legal, are more evenly balance.

14. While Gorman billed 0.2 hours and the Williams Mullen associate billed 0.3 hours, the time difference is not material. Usually, more is included in a time entry noted as a "telephone conference" than the actual conversation. It may involve preparing for the telephone call, making notes of the call or acting on the call, activities that may not take the same time for both participants.

of the law firm. A paralegal should be engaged in matters, under the supervision of an attorney, that require some independent judgment or are matters that an attorney would be expected to perform but can, under an attorney's supervision, be performed by an individual with specialized training or experience. Clerical functions such as typing, filing, photocopying, faxing, scanning or filing documents either electronically or traditionally, are not such functions. *See In re Joseph Charles & Assocs., Inc.,* 295 B.R. 399 (Bankr.S.D.Fla. 2003). There are court appearances where more than one attorney appeared when one attorney was sufficient.

Finally, there is the problem of travel time. The case was filed in Alexandria, Virginia. Williams Mullen has a local office in Northern Virginia. However, the attorneys initially assigned to the case were from the Richmond office. One attorney who provided significant research was from the Detroit office, although no travel was involved. The attorney who finally tried the case was from the Virginia Beach office. There are numerous local attorneys who could have handled the case for the Indenture Trustee. The selection of counsel is generally within the sound discretion of the client; however, where the fee for that counsel is to be shifted to another party, that discretion must be carefully exercised. If the Indenture Trustee wants to hire a Richmond or Virginia Beach or Detroit counsel, he may do so, but he should not expect the debtor to pay for any increased costs incurred for travel or communications or to pay higher rates where local counsel is available. In this particular case, there were relatively few court appearances and the additional travel time, particularly from Richmond, was not significant. No significant adjustment was made for the additional travel time in this case.

*Conclusion*

The court will allow the Indenture Trustee's request for attorney's fees in its proof of claim in the amount of $72,500.00 and costs in the amount of $9,295.51.