**In re TOBACCO ROW PHASE
IA DEVELOPMENT, L.P.,
Debtor.**

**No. 03–40033–DOT.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

March 17, 2005.

claims being paid at 10%. *See* 11 U.S.C. § 1322(b)(1).

Bruce H. Matson, Richmond, VA, for Debtor–in–Possession

W. Clarkson McDow, Jr., Columbia, SC, for Chapter 11 Trustee.

John G. McJunkin, Washington, DC, for Beal Bank, S.S.B.

## *MEMORANDUM OPINION*

DOUGLAS O. TICE, JR., Chief Judge.

Tobacco Row Phase IA Development, L.P., filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in October 2003. Since its filing, debtor has operated and managed its business as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. In November 2004, the court conducted a two day hearing that considered confirmation of debtor's plan of reorganization, opposed by Beal Bank, S.S.B., along with Beal Bank's motion to convert the case to a chapter 7.

Beal Bank is the holder of a second deed of trust on debtor's principal asset. Under

the plan and 11 U.S.C. § 1124, debtor proposes to cure its defaults under Beal Bank's note and reinstate the note's original maturity date. To effect a cure and reinstatement of the note, debtor must cure all underpayments of principal and interest, and debtor must compensate Beal Bank for damages it has incurred in reasonable reliance on debtor's default. Damages consist of Beal Bank's reasonable attorney fees.

The major dispute between the parties is the amount debtor will be required to pay, upon confirmation, to cure the Beal Bank note default, including the amount of attorney fees damages. The attorney fees are claimed by the bank's counsel, Piper Rudnik LLP. This issue is raised in debtor's objections to claims fifteen and sixteen of Beal Bank. The claims are of identical dollar amounts; claim fifteen is a secured claim that reflects Beal Bank's contention that it is fully secured, and claim sixteen is an unsecured claim that reflects debtor's contention that Beal Bank is fully unsecured. The parties have now agreed that Beal Bank's note is fully secured.

At the conclusion of the hearing, the court stated from the bench that confirmation of debtor's plan would be preferable to conversion of the case. The court is unable to make a final ruling on this issue until the cure amount is determined and accepted by the debtor as a modification of its plan. The court took under advisement ruling on the cure amount, including Piper Rudnik's reasonable attorney fees.

Subsequent to the hearing, Beal Bank submitted an addendum in support of its request for attorney's fees. Debtor filed an objection to and motion to strike the addendum, and other parties have joined in debtor's objection.

For reasons stated in this opinion, the court finds that debtor has defaulted in its monthly note payments to Beal Bank's note by making improper charges against operations that reduced "net cash." The parties must recalculate the default cure amount in accordance with the court's findings. The court has also calculated the reasonable attorney fees of the bank's counsel Piper Rudnik, which comprise an element of the cure amount.

*Findings of Fact.*

Debtor is a Virginia limited partnership with its principal place of business in the City of Richmond, Virginia, where it operates a 259 unit residential apartment complex known as Tobacco Row Apartments (the "project"). Debtor was formed in 1989 for the purpose of purchasing and renovating tobacco warehouses in an older part of the city with many obsolete, long abandoned tobacco warehouses and factories. Completed in 1991, the project caters to professionals who prefer to live close to downtown Richmond, and apartment units are available on monthly, three month and twelve month terms. The project features amenities that include a pool and patio area and a fitness room and volleyball court. Debtor has maintained a 90% or greater occupancy rate since filing for bankruptcy, and it has no monetary defaults other than the disputed debt to Beal Bank.

TR–GP, Inc., a Virginia corporation, is the general partner of debtor, and AIG SunAmerica, Inc. is a limited partner. McCormack Baron Ragon, Inc., (MBR) manages the project pursuant to a 1998 management agreement and receives a monthly management fee of 5% of the project's gross receipts.

Debtor financed the renovation of the warehouse though a United States Depart-

ment of Housing and Urban Development (HUD) insured loan of $14,593,700.00 that was secured by a first priority mortgage lien on the renovation project. In 1995, debtor, HUD and the holder of first priority lien bifurcated the first mortgage loan into a new first mortgage loan with fixed monthly payments and a second mortgage loan (the "cash flow note" or "second note") with a variable monthly payment. Beal Bank purchased the cash flow note from HUD in January 2001 and remains the holder of the note.

CW Capital LLC now holds the first mortgage. There are also three secured notes subordinate to Beal Bank's cash flow note. The Bank of New York holds a third priority deed of trust lien on the project securing its note with an original principal amount of $2,000,000.00. AIG SunAmerica, Inc., holds a fourth priority deed of trust lien on the project securing its note with an original principal amount of $900,000.00. Richmond Development LLC holds a fifth priority deed of trust lien on the project securing its note with an original principal amount of $1,900,000.00.

The cash flow note held by Beal Bank does not require a fixed monthly payment of principal and interest. Rather, the note requires debtor to pay to the note's holder 60% of month ending "net cash." The pertinent provisions of the note are as follows:

The said principal and interest shall be paid as follows:

[T]here shall be due an amount equal to sixty percent (60%) of available Net Cash as of the second preceding calendar month, which shall be applied first to interest accrued under this Second Deed of Trust Note and the remainder to principal. Net Cash will be calculated by subtracting from Net Operating Income amounts expended on (1) contributions to the Reserve for Replacements account established under the First HUD Regulatory Agreement; (2) debt service on the modified first Deed of Trust Note; (3) escrow deposits for real estate taxes, hazard insurance premiums, mortgage insurance premiums, and service charges due under the modified First Deed of Trust or hereunder; and (4) such other escrows or reserves as may be approved by Mortgagee. Net Cash will be calculated each calendar month and will be that sum shown on line four (4) of HUD Form 93479, Schedule A, Monthly Accounting Report.

Second Note, p. 1, Debtor's Ex. 1. The second note also defines "Net Operating Income" as follows:

"Net operating income shall mean the amount derived by subtracting from the gross revenues derived from the Project the operating and maintenance expenses of the project, exclusive of debt service payments due under the first and second Deed of Trust Loans on the Project."

Second Note, p. 2, Debtor's Ex. 1.

The borrower's charging of improper items against gross income or operating income harms the cash flow note holder Beal Bank because it reduces the final net cash figure of which Beal Bank is entitled to a fixed 60%.

The HUD Handbook instructs a borrower not to charge salaries of its "supervisory personnel" to the "project's operating account." HUD Handbook, 4381.1 Rev. 2, ¶ 6.38. The handbook also instructs the borrower not to fund "capital improvements" from project operating funds, but rather the borrower must use the retained

40% of net cash. A 1995 letter from HUD to debtor and regarding the cash flow note contains the following:

> 8. Any net cash remaining after payment of operating expenses and the full debtor service on the modified first mortgage will be divided between HUD and the owners with HUD having a 60 percent share and the owner having a 40 percent share. HUD's share of the net cash will be applied against the outstanding debt of the second mortgage. The owner's share will remain available to meet project obligations, including authorized distributions.

> 9. All future *capital improvements* are to be funded from the retainage of the owner's 40 percent share of net cash.

March 3, 1995, letter from Albert B. Sullivan, Director, Office of Multi Family Housing Management, Beal Bank Ex. 47 (emphasis added).

From January 2001 to October 2004, debtor paid from its operating account $145,603.00 or 50% of the salary of Susan Eubanks, a "Senior Area Supervisor" of MBR, debtor's management company. Debtor's Monthly Schedule A Forms, Beal Bank Ex. 9LL to 9RR; Debtor's Proposed Findings of Fact and Conclusions of Law, Para. 40. From 2001 to 2004 debtor also paid MBR $20,279.77 of the salary of Eddie Foley, a maintenance supervisor based in St. Louis. Heiney Testimony, Transcript, p. 101; Foley Salary Allocation, Beal Bank Ex. 104. In June 2004, MBR reimbursed debtor $17,373.56 of Foley's salary, and at trial debtor conceded that debtor should not have paid any of Foley's salary from its operating account. Heiney Testimony, Transcript, p. 101–103.

During 2001 debtor paid $47,100.00 from its operating revenues to Otis Elevator, an elevator contractor that installed, among other items, bronze interior panels, handrails, door kick boards, wood panel ceilings and lighting. Transcript of Rule 2004 Examination of Tom Dobbin, p. 52–55, Beal Bank Ex. 34. This work was an "upgrade" that would "improve the appearance of the elevators" and was not "routine maintenance." *Id.* at 54.

Beal Bank's counsel in this case has been the law firm of Piper Rudnik LLP. For the most part the bank has been represented by J. David Folds and Alan M. Noskow, who are associate attorneys in the firm's Northern Virginia office. Piper Rudnick's attorney fees and costs requests under the cash flow note are in the amount of $123,081.91, pre-petition, and $450,812.84, post-petition. The latter sum includes expert witness fees of $32,837.50 and includes amounts Beal Bank claims through a post hearing addendum that updates its fee request for attorney fees through November 2004. Folds' hourly rate in these fee requests was $310.00 in 2003 and $355.00 in 2004. Noskow's hourly rate in these fee requests was $245.00 in 2003 and $290.00 in 2004.

The hourly rates charged by attorney associates in the Richmond, Virginia, area with bankruptcy experience levels comparable to those of Folds and Noskow, would not have exceeded $250.00 and $190.00, respectively, in 2003 and $275.00 and $215.00, respectively, in 2004. Expert Report of Augustus C. Epps, Jr., Tobacco Row Ex. 36.

Additional findings of fact are stated below.

*Discussion and Conclusions of Law.*

In order for the court to approve confirmation of debtor's chapter 11 plan of reor-

ganization, debtor must cure its defaults in the second deed of trust note held by Beal Bank. In addition to note payment defaults, the cure amount includes Beal Bank's reasonable attorney fees. Because Beal Bank and debtor cannot agree on the cure amount, it must be calculated by the court.

Beal Bank's second deed of trust secures a cash flow note that obligates debtor to pay each month 60% of debtor's month end "net cash." The issue concerning defaults is whether debtor has made improper charges in arriving at net cash, which, of course, would reduce the required monthly payment. Debtor has conceded that it made some improper charges but defends other contested charges. With respect to the charges of Piper Rudnik, debtor disputes the fee claim as excessive.

"NET CASH" AND IMPROPER CHARGES AND ACCRUALS

■ Beal Bank's cash flow note states, "Net Cash" will be calculated each calendar month and will be that sum shown on line four (4) of HUD Form 93479, "Schedule A, Monthly Accounting Report." Second Note, p. 1, Debtor's Ex. 1. The note requires debtor to make payments equal to 60% of "net cash" to the note holder. *Id.* At hearing, Beal Bank argued that net cash in the cash flow note does not take into account opening cash as it appears on line one of HUD Form 93479. Beal Bank's expert witness supported this contention. Expert Report of Stewart A. Grubman, CPA, Beal Bank Ex. 89. Debtor's expert testified that net cash in the cash flow note does take into account opening cash as it appears on line one of HUD Form 93479. Expert Report of James P. Martinko, CPA, Debtor's Ex. 18.

The parties' disagreement about the inclusion of opening cash as the first factor in the month end calculation of net cash is more than a technicality. When debtor has a negative opening cash balance, debtor's inclusion of the negative opening cash balance in the month end calculation of net cash reduces the month end net cash by the amount of the negative figure. Debtor is obligated to pay Beal Bank 60% of month end net cash under the terms of the cash flow note. Reducing month end net cash by including the negative opening cash balance reduces debtor's payment to Beal Bank.

The court finds that net cash in the cash flow note does take into account opening cash. Line four of HUD Form 93479 states, "Cash On–Hand and in the Bank, End of Month (Line 1 + line 2 minus line 3)." Line 1 states "Cash On–Hand and in the Bank, Beginning of the Month." For net cash to equal line four of HUD Form 93479 as required by the second note, net cash must take into account beginning cash.

If debtor made improper charges to its operating account, this would reduce the net cash amount appearing on line four of the HUD form and reduce the monthly payment due Beal Bank. Likewise, if debtor made improper accruals in month one, with disbursement in month two or later, this would reduce the net cash amount and the monthly payment due Beal Bank.

■ The court finds that debtor improperly charged certain items to its operating account. From January 2001 forward, debtor paid from its operating account 50% of the salary of MBR's senior area supervisor Eubanks, totaling $145,603.00 prior to hearing. Eubanks is a regional supervisor who oversees multiple apartment complexes and spends a significant amount of time at apartment complexes

other than Tobacco Row. Eubanks maintains an office at Tobacco Row, but the record is unclear as to how much time she devotes to other projects while at the Tobacco Row office.

■ The HUD handbook appears to prohibit borrowers from paying supervisory personnel from the operating account, but debtor relies on a case in a line of cases that hold that the handbooks of federal agencies do not have the force of law. *See Beck Park Apts. v. U.S. Dept. Of Housing,* 695 F.2d 366, 370–71 (9th Cir. 1982) (provisions in an agency's handbook do not have the force of law that would prohibit HUD from reducing rents); citing *Rank v. Nimmo,* 677 F.2d 692, 698–99 (9th Cir.1982) (agency handbooks do not create an enforceable duty on the part of the Veterans Administration). But this court reads those cases to hold that agency handbooks do not impose obligations, contractual or otherwise, on federal agencies. *See Reynolds Assoc. v. United States,* 31 Fed.Cl. 335, 339 (1994) ("No incorporation of the HUD Handbook into the agreement appears either directly by express language or indirectly .... Nor were the HUD Handbook provisions themselves, with which HUD is accused of failing to comply ... set forth in the regulatory agreement."). It does not follow that regulated parties can disregard an agency handbook as no more than a collection of suggestions. In the instant case, the handbook can at the very least inform the court of what constitutes an operating expense, which the second note allows debtor to charge to operations, and what constitutes a management expense that debtor may not charge to operations.

HUD Management Agent Handbook 4381.5, section 6.39(c) states, "The salaries of agent supervisory personnel must be paid from the management fee [1] unless one of the exceptions below is met [ (1)oversight of centralized accounting and computer services for a project, and (2) salary of a supervisory employee replacing a project employee on temporary leave]." Section 6.38 also provides examples of "management costs charged to the project's operating account," which includes a category of "front-line costs and day-to-day activities," whereas 6.39 provides examples of "management costs paid from the management fee," which are "expenses for services that are not front-line activities." Additionally, the second note states, "Net operating income shall mean the amount derived by subtracting from the gross revenues derived from the project the operating and maintenance expenses of the project." Second Note, p. 2, Debtor's Ex. 1.

The court does not consider the salary, even a portion of the salary, of a supervisor with oversight of many projects along the East Coast to constitute "operating and maintenance expenses" of debtor. A post hoc rationalization that debtor may properly pay 50% of her salary to account for her limited front-line, day-to-day responsibilities on behalf of debtor does not persuade the court that the charges were proper. Debtor's attempt to bury this portion of Eubanks' salary under "corporate apartment expense" and not identify it as a salary expense further persuades the court that this was an improper charge to operations. Transcript of Rule 2004 Examination of Tom Dobbin, p. 25, Beal

---

1. Debtor pays a management fee to MBR equal to 5% of the project's gross receipts. HUD Management Agent Handbook 4381.5, section 6.39(c) imposes the financial burden, with exceptions, of providing for the salaries of supervisory personnel on the HUD project's management company and not the HUD project.

Bank Ex. 34; Transcript of Rule 2004 Examination of Linda Heiney, p. 19, Beal Bank Ex. 33. The court finds that the management handbook, in conjunction with the second note itself, adequately proscribes the payment of supervisory personnel salary from the operating account. Debtor must credit back to operations the full amount it paid toward Eubanks' salary and recalculate net cash.

Debtor also charged $20,279.77 to operations for the salary of Eddie Foley, a maintenance supervisor for MBR. This charge was likewise improper. Debtor has received a partial reimbursement of this amount, but debtor must credit the full amount back to operations and recalculate net cash

■ During 2001 debtor charged $47,100.00 to operations for work on its elevator interiors. While debtor performed this work on existing elevators, and debtor may have replaced worn-out materials, debtor did not replace worn out elevator interiors with comparable materials. The contractor installed, among other items, bronze interior panels, handrails, door kick boards, wood panel ceilings and lighting, etc. Transcript of Rule 2004 Examination of Tom Dobbin, p. 52–55, Beal Bank Ex. 34. Debtor's designee, Tom Dobbin, testified that this work was an "upgrade" that would "improve the appearance of the elevators" and was not "routine maintenance." *Id.* at 54.

The March 3, 1995, letter to debtor from HUD states in paragraph nine, "All future capital *improvements* are to be funded from the retainage of the owner's 40 percent share of net cash." Letter from Albert B. Sullivan, Director, Office of Multi Family Housing Management, Beal Bank Ex. 47 (emphasis added). Debtor's HUD accounting expert also concluded, "Capital improvements should not be deducted from net cash." Expert Report of James Martkinko, CPA, Conclusion no. 7, Debtor's Ex. 18. Martinko also concluded that a "capital *item*" is a proper operating disbursement. *Id.* at p. 3 (emphasis added). At hearing, Martinko stated that a "capital improvement" involved something new, in contrast to a "capital item" which involved the repair of existing property. Nov. 4 Transcript, p. 198. Debtor compares the elevator work to replacing an existing roof. The court likens the elevator work to replacing an existing worn-out asphalt shingle roof with a new slate roof and copper trim, and consequently, the court finds that the elevator upgrades constitute a capital improvement that debtor should not have charged to operations. Debtor must credit the full amount of $47,100.00 back to operations and recalculate net cash.

■ Beal Bank also contends that debtor subtracted improper accruals of future months' disbursements from the net cash figure. Debtor disputed this based on its expert evidence. Martinko's report explains, "[I]n practice, the computation of net cash includes significant unpaid bills ...." Debtor's Ex. 18. Martinko provides two examples that explain why debtor would reduce net cash by accruals:

Assume that the project did not make a mortgage payment on the first [mortgage] during January. If net cash did not take into account this unpaid obligation, cash could be paid to the holder of the second mortgage ignoring the obligation due under the first trust. In the restructuring of the mortgage, it would not be HUD's intent to allow this to occur.

Assume that the project receives a withdrawal from the reserves for replace-

ments[2] for major repairs in August. Further assume that the bill was not paid until September. The failure to take into account this unpaid bill would require the project to pay 60% of this receipt to the second mortgage holder, but when the bill was to be paid, the project would not have funds to pay the obligation.

*Id.* The court believes that debtor could work around this limitation by making mortgage payments in the month they are due and by not making withdrawals from the reserve for replacements until debtor is ready to pay an invoice. The court is not in a position to add terms to the cash flow note, terms that would enable debtor to accrue future disbursements. Debtor may not accrue future disbursements and must reverse accruals it has made and recalculate net cash.

To summarize, debtor must credit back to operations $145,603.00 it contributed to the salary of Eubanks and $20,279.77 less reimbursements of this amount it contributed to the salary of Foley. Debtor must credit back to operations $47,100.00 it paid for capital improvements to its elevators. Debtor must also reverse accruals of future disbursements and record disbursements at the time of payment. After re-crediting to operations the improper charges to operations and accruals, debtor must recalculate net cash and pay 60% of the increase in net cash, plus interest, to Beal Bank in accordance with the terms of the cash flow note.

## IMPROPER DISTRIBUTIONS TO LIMITED PARTNER

■ The regulatory agreement between HUD and debtor prohibits debtor from

making any distribution of income other than "surplus cash." Amended and Re-stated Regulatory Agreement for Multi-family Housing Projects, Beal Bank Ex. 5, Para. 6(e). The regulatory agreement defines surplus cash:

(f) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project; and

(ii) All tenant security deposits held.

Regulatory Agreement Para. 12(f). Paragraph 12(f)(1)(i) refers to cash flow note that Beal Bank now holds. In Beal Bank's motion to convert debtor's case from Chapter 11 to Chapter 7, Beal Bank contends that debtor has made improper payments to its limited partner SunAmerica in violation of the surplus cash limitation, thus "[insuring] there would never be surplus cash available for payments on the Third Note, the Fourth Note and the Fifth

---

**2.** The "reserve for replacements" is a fund debtor builds to provide money for future capital improvements.

Note." Beal Bank's motion to convert to Chapter 7, p. 12. Beal Bank further contends that debtor "applied the distributed funds to interest on the fifth note," held by an insider, and that service of the fifth priority mortgage debt is done "to the detriment of the ... second, third, and fourth note holders." *Id.* at 13.

The court has determined that debtor took improper charges and accruals against operations, reducing net cash to the detriment of Beal Bank's rights as holder of the cash flow note, and the court will rule that debtor must properly recalculate net cash and cure the default. But debtor's improper distribution of any retained 40% of net cash does not impair Beal Bank's claim. These disputed payments are not grounds to convert the case and deny confirmation of debtor's proposed plan. *See* 11 U.S.C. §§ 1124 and 1129(a)(7).

If improper distributions of the retainage harmed the holders of notes subordinate to the cash flow note, it is up to those note holders to file claims against the bankruptcy estate for the arrearages and protect their own interests. The holders of the subordinate notes have not filed claims for arrearages.

ATTORNEY FEES

■ The court has found that debtor defaulted under the cash flow note by understating net cash due to improper charges to operations. The cash flow note provides, "In the event of default of payment of this Second Deed of Trust note and, if the same is collected by an attorney at law, the undersigned hereby agree(s) to pay all costs of collection, including a *reasonable* attorney's fee." Second Note, p. 2, Debtor's Ex. 1 (emphasis added).

Debtor must pay Beal Bank's reasonable attorney fees to cure and reinstate the cash flow note. The bank's counsel claims prepetition fees and expenses of $123,081.91 and post petition fees and expenses of $450,812.84. Debtor contends that the fees are grossly excessive, both in terms of the large number of hours worked and the attorneys' hourly rates relative to the hourly rates of comparably qualified Richmond attorneys. Resolution of the dispute over the attorney fees has required the court to make a difficult analysis of hundreds of hours billed by Piper Rudnick. This analysis reveals that counsel's charges for representing the bank must be significantly reduced.

Beal Bank's damages are limited not only by the terms of the cash flow note providing for "a reasonable attorney's fees" but also by the bankruptcy code and case law. Bankruptcy Code § 506(b) limits Beal Bank to "reasonable fees, costs, or charges provided for under the agreement under which such claim arose," and § 1124(2)(C) limits Beal Bank to "damages incurred as a result of any reasonable reliance ... on such contractual provision ...." The code limits Beal Bank's damages to reasonable fees based on its reasonable reliance on the terms of the cash flow note. The case of *In re Valley Historic Ltd. P'ship*, 307 B.R. 508 (Bankr. E.D.Va.2003), provides an analogy to the instant case. *See also Barber v. Kimbrell's, Inc.*, 577 F.2d 216 n. 28 (4th Cir. 1978) (providing for the "lodestar" analysis).

The court in *Valley Historic Ltd. P'ship*, 307 B.R. at 512, analyzed several factors to gauge the reasonableness of the creditor's attorney's fees. As a preliminary matter, the court noted that the debtor's total bankruptcy related attorney's fees should normally be higher than the fees of any particular creditor because, "[A] debtor is

juggling many balls at the same time, trying to keep them all in the air. A creditor is only interested in getting his ball back." *Id.* Tobacco Row is negotiating with many creditors, preparing financial information, proposing a plan of reorganization, etc., whereas Beal Bank is simply trying to collect a partial default on one note.

At hearing, debtor presented the expert testimony of Augustus C. Epps, Jr., a long-practicing Richmond bankruptcy attorney. Epps reviewed the hourly rates for Beal Bank's attorneys and compared those rates to the hourly rates of comparably qualified Richmond attorneys from the Richmond offices of ten local, regional and national firms.

Epps' uncontested report established that qualified associates of Richmond area law offices, with a level of experience comparable to debtor's attorneys, J. David Folds and Alan M. Noskow, would not exceed an hourly rate of $250.00 and $190.00 respectively in 2003 and $275.00 and $215.00 respectively in 2004.[3] Report of Augustus C. Epps, Jr., Debtor's Ex. 36. Fold's hourly rate was $310.00 in 2003 and $355.00 in 2004. *Id.* Noskow's hourly rate was $245.00 in 2003 and $290.00 in 2004. Addendum in Support of Beal Bank's Request for Legal Fees. Debtor's principal attorney, Christopher Jones, is an associate of LeClair Ryan, P.C., one of Richmond's larger firms, had an hourly rate of $195.00 in 2003 and $205.00 in 2004. Report of Augustus C. Epps, Jr., Debtor's

Ex. 36. Debtor's expert also concluded that Folds and Jones had a comparable level of experience. *Id.* Folds' hourly rate exceeded Jones' hourly rate by 58.97% in 2003 and 73.17% in 2004.[4]

The court finds Epps' testimony and conclusions persuasive. The hourly rates of Beal Bank's counsel exceeded the hourly rates of the priciest Richmond counsel of comparable skill and experience. Epps's testified that Beal Bank's interests did not require any specialized bankruptcy expertise that would justify the high rates of out-of-town counsel. The HUD issues were not complex. The primary issues of the case centered on the interpretation of the cash flow note. Beal Bank's attorney's fees grossly exceed the debtor's attorney's fees that related to addressing Beal Bank's contentions and exceeded debtor's total fees in this case. This court reaches the same preliminary conclusion that the court in *Valley Historic Ltd. P'ship* reached:

> Where, as here, the case is a basic real estate case and the creditor's attorney's fees are so disproportionate to the nature of the case, the work that would be expected and the debtor's attorney's fee, any presumption that the attorney's fees claimed under the proof of claim are validly claimed has been overcome and a further examination is warranted.

*Id.* at 512.

Beal Bank's attorney's fees must be examined under factors of the lodestar analy-

---

**3.** Epps based his rate ceiling on the assumption "that Beal Bank would hire one of Richmond's larger firms."

**4.** Debtor's objection to Beal Bank's request for attorney's fees states that Jones was admitted to practice in 1996, and that Folds was admitted to practice in 1993. Noskow was admitted to practice in 2000. Debtor's objection also compares the hourly rate of Bruce

Matson, the LeClair Ryan partner in charge of debtor's bankruptcy case, to Fold's hourly rate. Matson was admitted to practice in 1983 and had an hourly rate of $310.00 in 2003 and $325.00 in 2004. Folds is far less experienced that Matson, yet Folds has a higher hourly rate.

sis of *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n. 28 (4th Cir.1978).[5] The court is aware that in large chapter 11 cases involving law firms outside the Richmond area, attorneys may charge hourly rates that exceed local rates. These cases often require the expertise of outside law firms due to the nature and difficulty of the issues raised. However, when brought into issue, all fees are subject to the lodestar analysis, which by definition considers appropriate hourly rates and difficulty of the issues.

Time and Labor Expended. Beal Bank's attorneys' invoices reveal that counsel spent many hundreds of hours over a period exceeding one-year. The court has serious reservations about whether the time charges were fully warranted under the circumstances. It is also noted that Piper Rudnik's original invoices tend to improperly block hourly charges, a defect that the firm has attempted to remedy by revised billing statements it filed after the hearing.

Novelty and Difficulty of the Issue and the Skill Required. Epps' uncontested testimony and the court's observations of the hearing and evidence persuade the court that the issues at trial were not complex and did not require the skill of a bankruptcy attorney with HUD/subsidized housing or other specialty experience. While the cash flow note is novel, its terms are not complex, and parties must simply calculate net cash due thereunder to Beal Bank.

■ Customary Fee for Like Work. The prevailing market rate in Richmond is the "central factor in determining an appropriate award of compensation . . . ." *In re Computer Learning Centers, Inc.*, 285 B.R. 191, 227 (Bankr.E.D.Va.2002); followed by *In re New Boston Coke Corp.*, 299 B.R. 432 (Bankr.E.D.Mich.2003).[6]

According to Beal Bank's evidence, Piper Rudnick charges it somewhat less than its usual rates due to their longstanding relationship. But the bank did not present

---

**5.** The lodestar factors are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases.

**6.** Other courts have also settled on the local rate as reasonable compensation. *See Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)(observing in a 42 U.S.C. § 1988 action that courts "have properly required prevailing attorneys to justify the reasonableness of the requested rate"

and "produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation"); *In re Patronek*, 121 B.R. 728, 731 (Bankr.E.D.Pa.1990)(market rate for chapter 13 cases is "what an informed client and informed attorney are actually agreeing to pay in the local marketplace"); *In re Masterwear Corp.*, 233 B.R. 266 (Bankr.S.D.N.Y. 1999)("The reasonable hourly rates are the prevailing rates for similar services by lawyers of reasonably comparable skill, experience and reputation in the relevant legal market . . . .")(citing *Blum v. Stenson, supra*). *Compare In re Bennett Funding Group, Inc.*, 213 B.R. 234, 250 (Bankr.N.D.N.Y.1997) (deeming it acceptable that a party hired attorneys from outside the "geographic area" with higher hourly rates due to the "complexity and magnitude" of the cases).

evidence of the hourly rates of Richmond attorneys with skill and experience comparable to its attorneys from Piper Rudnick. Debtor's expert established that associates of the Richmond offices of the largest firms, with skill and experience levels comparable to debtor's attorneys J. David Folds and Alan M. Noskow, would not exceed an hourly rate of $250.00 and $190.00 respectively in 2003 and $275.00 and $215.00 respectively in 2004. At the same time, the court recognizes the fact that Piper Rudnick is Beal Bank's regular counsel and will not hold the law firm strictly to local Richmond rates. David Folds, although an associate rather than a partner of the firm, demonstrated high capability in representing the bank; that capability should be taken into account in fixing his rate. The court will allow an hourly rate for Folds and Noskow of $275.00 and $190.00, respectively, for 2003 charges and $300.00 and $215.00, respectively, for 2004. The court will allow an hourly rate for associates junior to Noskow of $170.00 for 2003 and $195.00 for 2004. These rates are higher than the local rates and substantially higher than the hourly rates of associates of debtor's counsel.

Debtor's attorney Bruce Matson, the partner-in-charge, had an hourly rate of $310.00 in 2003 and $325.00 in 2004 according to LeClair Ryan's fee applications. Matson's hourly rates were less than Fold's hourly rates. Matson's hourly rates are a reasonable ceiling and include a partner's reasonable premium over the hourly rates of associates, and the court will adopt Matson's hourly rates as the rates at which debtor must reimburse Beal Bank for the legal work of the Piper Rudnick partners supervising this case.

Piper Rudnick also made extensive use of paralegals and legal assistants whose rates range from $95.00 to $175.00 per hour. For paraprofessionals, the court will allow an hourly rate of half the average of associates Folds' and Noscow's hourly rates; $116.25 for 2003 and $128.75 for 2004.

Amount in Controversy and the Results Obtained. Beal Bank seeks a base cure amount of $114,475.00 plus interest of $30,249.80 through November 30, 2004. The court will rule in Beal Bank's favor on the base cure amount and order debtor to credit the improper charges back to operations and recalculate net cash as the court discusses above. But Beal Bank's objection to debtor's use of cash collateral despite debtor's offer of adequate protection was unsuccessful as was its motion to convert just prior to the confirmation hearing. The court considers both of these actions as having little merit. Beal Bank's opposition to debtor's motion to extend the exclusive period and opposition to approval of debtor's disclosure statement were also unsuccessful. In fact, debtor's expert refers to these for items as "doomed to failure." Report of Augustus C. Epps, Jr., Debtor's Ex. 36.

Beal Bank also seeks attorney's fees and costs exceeding one-half million dollars. These are grossly disproportional to the base cure amount, and a large portion of these fees represent attorney work that did not obtain positive results for Beal Bank. In fact, a portion of Piper Rudnick's legal fees are a result of Beal Bank trying to recover legal fees that the court will disallow.

Experience, Reputation and Ability of the Attorney. There is no issue over Piper Rudnik's experience, reputation and ability to represent Beal Bank in the present case.

■ Nature and Length of the Relationship Between Attorney and Beal Bank.

Beal Bank's employee testified that Beal Bank employs Piper Rudnick on a regular basis in the same capacity as in the present dispute and has done so for a lengthy period. The employee testified to certain efficiencies that have developed between Beal Bank and Piper Rudnick over the course of the relationship. However, the dispute between Beal Bank and debtor is not complex. Any efficiencies that have developed between Beal Bank and its counsel do not justify hourly rates so in excess of the hourly rates of comparable Richmond attorneys. In fact, any initial efficiencies garnered from their relationship were surely swamped by the seemingly excessive number of billing hours Piper Rudnick claims in its fee application.

Summary. Beal Bank is not entitled to an award of attorney's fees to the extent its incurred fees stem from the substantial excess of Piper Rudnick's hourly rates over the hourly rates of comparably qualified attorneys of large Richmond firms and Richmond offices of national firms that Epps identified in his uncontested testimony. The rates the court has selected take into account Beal Bank's relationship with Piper Rudnick along with the rates of the attorneys of the largest firms that regularly practice before the court in corporate bankruptcy cases. *See In re Computer Learning Centers, Inc.*, 285 B.R. at 228. The bank is also not entitled to any award of attorney fees to the extent the fees are a result of legal work unnecessary in this case.

As discussed above, the court finds that the law firm did unnecessary work and made hourly time charges that exceeded the lodestar guidelines. However, there is

no doubt that the bank's counsel is entitled to a substantial portion of its billing hours, and the court will reduce the number of the law firm's allowable hours by just 10%.

The addendum to this opinion provides the court's calculations, working from Piper Rudnick's 2003 and 2004 invoices that the bank included as exhibits in its request for attorneys' fees and restated request for attorney fees and addendum. The court will allow costs as billed. Debtor has not presented evidence demonstrating that Piper Rudnick's costs were excessive.

The invoices appear incomplete and do not total to the same balance as Beal Bank's claim, perhaps because the court has overlooked certain invoices. But the court expects the parties to apply the above reductions of rates and hours, which the court also exhibits in the opinion's addendum, claims for pre and post petition fees.[7]

BEAL BANK'S ADDENDUM IN SUPPORT OF ATTORNEY'S FEES

At the time of the November 2004 hearing, Beal Bank and its counsel had submitted fee applications for billings only through August 2004. The bank reserved the right and obtained leave to supplement its claim with subsequent billings. On December 13, 2004, the bank filed an addendum in support of its claim for attorney's fees. The addendum updated the claim with fees incurred into December 2004 and structured the previously submitted invoices in a manner commensurate with U.S. Trustee Guidelines. The December application increased the attorney fee claim by $172,070.74 for charges after August 2004. Debtor contests the new fees

---

7. Some of the figures in the addendum have changed since this memorandum opinion was entered. However, they do not affect the court's determination of the outcome as stated in this opinion.

and contends the bank abused its leave to supplement the claim due in part to the dollar amount of this latest submission.

Much of the supplemental fee request is work Piper Rudnick performed while advancing Beal Bank's opposition to confirmation of debtor's proposed plan and motion to convert. The court will reduce the new charges in line with the previous discussion.

■ Debtor also notes that the bank's counsel restated prior invoices and that the restated invoices have " 'de-lumped' time entries" that correspond to U.S. Trustee Guidelines. Debtor contends that the bank did not seek leave to restate prior invoices, which at this late date is prejudicial. The court agrees that counsel's restatement of prior invoices is prejudicial. Hearing on the allowability of attorney's fees was held in November 2004, and the bank had the opportunity to defend its claim. Using the original invoices, debtor demonstrated that the attorney fee claim was excessive. Beal Bank's restatement of invoices previously submitted will not be considered as evidence of the reasonableness of the claim for attorney fees.

■ The court also questions the reliability of the restated invoices. The restated invoices were "prepared by reference to contemporaneous records or by review of the attorney's or other timekeepers in question." Post hoc reconstruction, based on the long-term memory of the attorney or paralegal who made the entry, is not acceptable.

### Summary and Conclusion

Debtor defaulted on Beal Bank's second deed of trust note by making improper charges. In order to cure the default and reinstate the bank's note, debtor must remit full payment of the amounts described in this opinion. Debtor must credit back to operations $145,603.00 it contributed to the salary of Eubanks and $20,279.77 less reimbursements of this amount it contributed to the salary of Foley. Debtor must credit back to operations $47,100.00 it paid for capital improvements to its elevators. Debtor must also reverse accruals of future disbursements and record disbursements at the time of payment. Debtor's improper distribution of any retained 40% of net cash does not impair Beal Bank's claim. After recrediting to operations the improper charges to operations and accruals, debtor must recalculate net cash and pay 60% of the increase in net cash, plus interest, to Beal Bank in accordance with the terms of the cash flow note. Debtor is likewise liable for Beal Bank's reasonable attorney fees in contemplation of debtor's default under the cash flow note.

Based on the court's previous findings, the court has calculated the allowable attorney fee to be $340,323.61 as shown on the Addendum attached to this opinion. The parties are requested to review the addendum and point out any errors or omissions of invoices and apply the court's analysis in the text of the opinion and addendum to any omissions.

The purpose of this opinion has been for the court to make a finding of the cure amount to be paid by debtor to Beal Bank in order to reinstate the second deed of trust note, which is necessary if debtor's chapter 11 plan is to be confirmed. Based on the cure amount, including the attorney fees, debtor must then decide whether it wishes to continue to pursue confirmation. The court directs the parties to calculate the full cure amount in accordance with the above findings and submit the result to the court.

No order will be entered before the cure amount has been established. The court will set the case back on the docket for a status hearing, at which time any remaining dispute over the cure amount may be considered. Beal Bank's motion to convert the case to a chapter 7 will also be continued to the status hearing. The court invites the parties to contact chambers with alternative suggestions.